FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INDUSTRIAL CUSTOMERS OF NORTHWEST UTILITIES,<br>                    *Petitioner*,<br><br>v.<br><br>BONNEVILLE POWER ADMINISTRATION,<br>                    *Respondent*,<br><br>PORT TOWNSEND PAPER CORPORATION; AVISTA CORPORATION; ALCOA INC.; IDAHO POWER COMPANY; PUGET SOUND ENERGY, INC; PACIFICORP; PORTLAND GENERAL ELECTRIC COMPANY,<br>          *Respondents-Intervenors*. | No. 11-71368 |

| | |
|---|---|
| PUBLIC POWER COUNCIL,<br>                    *Petitioner*,<br><br>v.<br><br>U.S. DEPARTMENT OF ENERGY; BONNEVILLE POWER ADMINISTRATION, | No. 11-71396 |

*Respondents*,

AVISTA CORPORATION; ALCOA INC.;
IDAHO POWER COMPANY;
PORTLAND GENERAL ELECTRIC
COMPANY,
            *Respondents-Intervenors*.

PACIFIC NORTHWEST GENERATING
COOPERATIVE; BLACHLY-LANE
COUNTY COOPERATIVE ELECTRIC
ASSOCIATION; CENTRAL ELECTRIC
COOPERATIVE INC.; CLEARWATER
POWER COMPANY; CONSUMERS
POWER, INC.; COOS-CURRY
ELECTRIC COOPERATIVE, INC.;
DOUGLAS ELECTRIC COOPERATIVE;
FALL RIVER RURAL ELECTRIC
COOPERATIVE, INC.; LANE ELECTRIC
COOPERATIVE; LINCOLN ELECTRIC
COOPERATIVE, INC.; NORTHERN
LIGHTS, INC.; OKANOGAN COUNTY
ELECTRIC COOPERATIVE, INC.; RAFT
RIVER RURAL ELECTRIC
COOPERATIVE, INC.; UMATILLA
ELECTRIC COOPERATIVE
ASSOCIATION; WEST OREGON
ELECTRIC COOPERATIVE, INC.,
            *Petitioners*,

v.

No. 11-71401

U.S. DEPARTMENT OF ENERGY;
BONNEVILLE POWER
ADMINISTRATION,
                    *Respondents*,

ALCOA INC.; AVISTA CORPORATION;
IDAHO POWER COMPANY; PUGET
SOUND ENERGY, INC; PACIFICORP;
PORTLAND GENERAL ELECTRIC
COMPANY,
          *Respondents-Intervenors*.

CANBY UTILITY BOARD,                    No. 11-71419
               *Petitioner*,

          v.
                                        OPINION
U.S. DEPARTMENT OF ENERGY;
BONNEVILLE POWER
ADMINISTRATION,
                    *Respondents*,

ALCOA INC.; IDAHO POWER
COMPANY; AVISTA CORPORATION;
PUGET SOUND ENERGY, INC;
PACIFICORP; PORTLAND GENERAL
ELECTRIC COMPANY,
          *Respondents-Intervenors*.

On Petition for Review of the
Bonneville Power Administration

Argued and Submitted
May 9, 2013—Portland, Oregon

Filed September 18, 2014

Before: Alex Kozinski, Chief Judge, and Stephen Reinhardt
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Reinhardt

**SUMMARY**[*]

**Bonneville Power Administration**

The panel denied in part, and granted in part, petitions for review brought by public utilities and cooperatives who buy power from the Bonneville Power Administration and industrial customers who are end-users of BPA power, challenging the BPA's decision not to seek refunds of unlawful subsidies that the BPA previously gave to certain longtime industrial customers and which were invalidated by prior Ninth Circuit decisions.

The petitioners alleged that their power costs had been impermissibly raised by BPA's decision because, if BPA sought refunds of the subsidies, it could pass along the recovered funds to its customers as lower rates. At issue are three contractual arrangements: the 2007 Block Contracts

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(three way contracts between BPA, Alcoa Inc. and two other aluminum direct-service customers, and local public utilities in which BPA agreed to make payments to the aluminum companies in lieu of supplying them with actual electrical power); the Alcoa Amendments (an amended contract in which BPA again agreed to subsidize Alcoa rather than sell it power directly); and the Port Townsend Contract (an arrangement in which BPA supplied Port Townsend Paper Company, a non-aluminum direct-service customer, with its full requirements for power at a reduced rate).

The panel held that the BPA had no general constitutional or statutory duty to seek a refund any time it made an unlawful payment, but an individual decision not to pursue such a refund could be arbitrary, capricious or an abuse of discretion under the Administrative Procedure Act. The panel also held that the BPA's decisions in most respects sufficiently and reasonably balanced its competing obligations to merit the panel's deference, but in one respect did not. Finally, the panel held that the BPA reasonably explained why the challenged refund decisions were not inconsistent with BPA's earlier decision to seek recovery of the different payments that had been declared unlawful by the court in *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007).

The panel denied the petition for review with regard to the decision not to seek refunds with respect to the 2007 Block Contracts and the Port Townsend Contract. The panel granted the petition and remanded to the BPA for further proceedings with regard to recovery of subsidies paid under the Alcoa Amendment.

Judge Reinhardt concurred in part, but dissented from section B.1.a which related to the 2007 Block Contracts. Judge Reinhardt would hold that the contractual damages waiver provision in the 2007 Block Contracts, as applied, operated in excess of the BPA's statutory authority.

**COUNSEL**

Melinda J. Davison (argued) and Irion Sanger, Davison Van Cleve, P.C., Portland, Oregon, for Petitioner Industrial Customers of Northwest Utilities.

Zabyn Towner, Pacific Northern Generating Cooperative, Portland, Oregon, for Petitioners Pacific Northwest Generating Cooperative and Members.

David F. Doughman, Beery Elsner & Hammond LLP, Portland, Oregon, for Petitioner Canby Utility Board.

Irene A. Scruggs (argued), Public Power Council, Portland, Oregon, for Petitioner Power Council.

Randy A. Roach, General Counsel, Timothy A. Johnson, Assistant General Counsel, Jon D. Wright (argued) and Hilary Browning-Craig, Attorneys, Bonneville Power Administration, Portland, Oregon; and S. Amanda Marshall, United States Attorney, District of Oregon, Stephen J. Odell, Assistant United States Attorney, David J. Adler and J. Courtney Olive, Special Assistant United States Attorneys, Portland, Oregon, for Respondent Bonneville Power Administration.

Michael C. Dotten (argued) and Dustin T. Till, Marten Law, Portland, Oregon, for Intervenor Alcoa Inc.

Jay T. Waldron and Sara Kobak, Schwabe Williamson & Wyatt P.C., Portland, Oregon; and Ryan L. Flynn, PacifiCorp, Portland, Oregon, for Intervenor PacifiCorp.

Donald G. Kari and Jason Kuzma, Perkins Coie LLP, Bellevue, Washington; and Dan L. Bagatell, Perkins Coie LLP, Phoenix, Arizona, for Intervenor Puget Sound Energy, Inc.

Michael G. Andrea, Avista Corporation, Spokane, Washington, for Intervenor Avista Corporation.

R. Blair Strong, Paine Hamblen LLP, Spokane, Washington, for Intervenor Idaho Power Company.

Scott G. Seidman, Tonkon Torp LLP, Portland, Oregon, for Intervenor Portland General Electric Company.

Leonard J. Feldman, Marcus Wood, and Maren R. Norton, Stoel Rives LLP, Seattle, Washington, for Intervenor Port Townsend Paper Corporation.

**OPINION**

BERZON, Circuit Judge:

The Bonneville Power Administration ("BPA") is an agency within the Department of Energy that markets the energy output of federal power projects in the Pacific Northwest. In two previous decisions, we invalidated three

sets of contractual arrangements in which BPA agreed to subsidize certain longtime industrial customers rather than sell them power directly. *See Pac. Nw. Gen. Coop. v. Bonneville Power Admin.* ("*PNGC II*"), 596 F.3d 1065 (9th Cir. 2010); *Pac. Nw. Gen. Coop. v. Dep't of Energy* ("*PNGC I*"), 580 F.3d 792 (9th Cir 2009). We held these subsidy arrangements unreasonable and contrary to BPA's statutory authority, as they did not comport with Congress's mandate that BPA operate in a businesslike manner. *See* 16 U.S.C. §§ 839f(b), 838g.

In both cases, we remanded to BPA the question whether it could or should seek refunds of the improper subsidies. On remand, BPA concluded that it was contractually barred from seeking refunds as to some of the invalidated contracts, and that it had no legal or equitable basis for seeking refunds as to the others. Moreover, BPA concluded, if it did pursue recovery of the subsidies, it might face counterclaims from the subsidized entities and become mired in counterproductive, protracted litigation over the amount, if any, of refunds owed. As a result, BPA decided not to pursue recovery of the unlawful subsidies invalidated by *PNGC I* and *PNGC II*.

At issue in this consolidated appeal are challenges by two groups to BPA's decision to forgo refunds: public utilities and cooperatives that buy power from BPA, and that Congress has designated as BPA's first-priority or "preference" customers; and industrial customers who buy power from public utilities in the Pacific Northwest and so are end-users of BPA power. The challengers' core argument is that their power costs have been impermissibly raised by BPA's decision because, if BPA did seek refunds of the

subsidies, it could pass along the recovered funds to its customers as lower rates.

## BACKGROUND

"BPA is an agency within the Department of Energy created by Congress in 1937" to "market[] the power generated by federally owned dams on the Columbia River." *Portland Gen. Elec. Co. v. Bonneville Power Admin.* ("*PGE*"), 501 F.3d 1009, 1013 (9th Cir. 2007); *see* 16 U.S.C. §§ 832–832m. "Congress has since expanded BPA's mandate to include marketing authority over nearly all the electric power generated by federal facilities in the Pacific Northwest." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.* ("*APAC*"), 126 F.3d 1158, 1163 (9th Cir. 1997); *see* 16 U.S.C. § 838f. In numerous prior opinions, we have provided extensive background on BPA's history and operations. *See, e.g.*, *PGE*, 501 F.3d at 1013–16; *PNGC I*, 580 F.3d at 797–800; *APAC*, 126 F.3d at 1163–66. Here, we summarize only those statutory provisions and recent developments directly relevant to this appeal.

### A. Statutory Framework

Four statutes govern BPA's operations: the Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. §§ 839–839h ("Northwest Power Act"); the Pacific Northwest Federal Transmission System Act of 1974, 16 U.S.C. §§ 838–838k ("Transmission Act"); the Pacific Northwest Consumer Power Preference Act of 1964, 16 U.S.C. §§ 837–837h ("Preference Act"); and the Bonneville Project Act of 1937, 16 U.S.C. §§ 832–832m ("Bonneville Project Act"). As we have noted before, "[t]hese statutes subject BPA to a variety of detailed and

potentially conflicting statutory directives," ranging from fiscal to environmental concerns. *APAC*, 126 F.3d at 1164. Of most direct relevance to this appeal are two sets of statutory directives: the rate-setting guidelines and the "sound businesslike principles" obligation.

### 1.  Rate-Setting Guidelines

A complex of statutory provisions dictates how BPA must proceed when selling federal power. First, BPA must give priority, as well as its most favorable cost-based rate ("the PF rate"), to publicly owned utilities, cooperatives, and federal agencies, known as "preference customers." *PNGC I*, 580 F.3d at 798–99, 802; *PGE*, 501 F.3d at 1013–15; *see* 16 U.S.C. §§ 839c(b), 839e(b). Preference customers are also the only group whose energy needs BPA is *required*, as opposed to *authorized*, to meet. *See PNGC I*, 580 F.3d at 811. After meeting the preference customers' needs, BPA may, if it so chooses, sell surplus power directly to certain longstanding industrial customers ("direct-service industrial customers" or "DSIs") at a higher but still-cost based rate ("the IP rate"), or to anyone else at market rates. *Id.* at 799, 802–03; *PGE*, 501 F.3d at 1014; *see* 16 U.S.C. § 839e(c).[1] "Regardless of the type of customer, BPA must charge a rate that, at a minimum, recoups BPA's own costs of generating or acquiring the electricity." *Alcoa, Inc. v. BPA*, 698 F.3d 774, 780 (9th Cir. 2012); *see* 16 U.S.C. § 839e(a)(1).

---

[1] This summary is simplified, and so omits some of BPA's less relevant rate-setting strictures, detailed more fully in *PNGC I*, 580 F.3d at 802–03.

## 2. Sound Business Principles

In addition to the above rate-setting guidelines, BPA also must set rates "with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers *consistent with sound business principles*." 16 U.S.C. § 838g (emphasis added).  A different provision similarly requires that BPA set rates that "recover, *in accordance with sound business principles*, the costs associated with the acquisition, conservation, and transmission of electric power." *Id.* § 839e(a)(1) (emphasis added).  More generally, Congress has directed BPA to implement the Northwest Power Act "in a *sound and businesslike manner*." *Id.* § 839f(b) (emphasis added).  We have previously explained that BPA's business decisions are judicially reviewable for compliance with this overarching "sound business principles" standard, albeit with great deference to BPA's conclusions.  *See Alcoa*, 698 F.3d at 788–89; *PNGC II*, 596 F.3d at 1075–80.

## B.  The Aluminum DSI Contracts

Historically, the aluminum manufacturers of the Pacific Northwest were among BPA's largest direct-service industrial customers. *See PNGC I*, 580 F.3d at 797–98.  Until recently, BPA did not have trouble meeting the needs of its preference customers while also providing abundant power to the aluminum DSIs, including Alcoa. *See id.*  But, as the Pacific Northwest has grown, BPA has found itself constrained by competing demands.  Its preference customers now serve a larger population with greater energy needs, and rising energy prices have made BPA's relatively cheap power increasingly attractive to nonpreferential would-be buyers. *See id.* at 798.

Beginning in 2007, BPA embarked upon a series of attempts to aid the aluminum manufacturers without selling them power directly. *See id.*

### 1. *The 2007 Block Contracts (*PNGC I*)*

In 2006, BPA entered into three-way contracts, effective starting in the 2007 fiscal year, between BPA; Alcoa, and two other aluminum DSIs; and local public utilities ("the 2007 Block Contracts" or "Block Contracts"). The DSIs wanted to continue buying physical power from BPA at a cost-based rate. Instead, BPA agreed "to make payments to the [aluminum DSIs] totaling a maximum of $59 million per year for five years in lieu of supplying them with actual electrical power, while retaining the option to sell them physical power instead in the final two years." *PNGC I*, 580 F.3d at 798.[2]

Alcoa challenged these contracts, arguing that BPA was required to sell it physical power, sufficient to meet its needs, at a cost-based rate. *Id.* at 806–07, 809. Concurrently, several of BPA's preference and other industrial customers challenged the same contracts from the opposite direction, objecting to subsidies *or* sales to the DSIs except for discretionary market-rate sales of surplus power. *Id.* at 807–09.

We held that, under the relevant statutory provisions, BPA is not *required* to sell physical power to the DSIs. *Id.* at 811–12. Rather, it is required to meet the power needs only

---

[2] The two other aluminum DSIs that received Block Contracts were Golden Northwest Aluminum and CFAC. However, Golden Northwest subsequently allocated its power allocation to Alcoa and CFAC, so BPA never made any payments to Golden Northwest.

of its preference customers, and has the *option* to sell to DSIs thereafter, if it so chooses. *Id.* However, if BPA does sell to DSIs, it must offer them the IP rate, not a market rate. *See id.* at 812–18. We also held that, "under appropriate circumstances, BPA may lawfully monetize its energy contracts," "so long as the decision to monetize is otherwise consistent with BPA's statutory obligations." *Id.* at 819, 820. But we did not find the Block Contracts justified under that standard. As the Block Contracts were effectively a sale of power "at a rate below what [BPA] is statutorily required to offer (i.e., the IP rate), and below what it could receive on the open market" from non-DSI customers, the contracts were inconsistent with BPA's statutory obligation to fulfill its role consistent with "sound business principles." *Id.* Consequently, "BPA's decision to monetize the aluminum DSI contracts amount[ed] to an impermissible subsidy of those companies' operations." *Id.* at 819.

The question remained whether the aluminum DSIs owed BPA a refund for any past subsidy payments. Each of the Block Contracts contained a damages waiver providing,

> In the event the Ninth Circuit Court of Appeals or other court of competent jurisdiction issues a final order that declares or renders this Agreement void or otherwise unenforceable, no Party shall be entitled to any damages or restitution of any nature.

*Id.* at 826. We did not decide in *PNGC I* whether this waiver was applicable, noting that there was no indication in the administrative record of "how BPA believe[d] the damages waiver provision should be construed and, in particular, what effect it [was] to have if a contract [were] only partially

invalidated." *Id.* Instead, we remanded to BPA "to determine in the first instance the applicability and construction" of several elements of the Block Contracts, including the damages waiver. *Id.* at 827. In doing so, we made clear that we were not declaring the Block Contracts void *ab initio. Id.* at 826–27. Rather, given that the contracts contained a severability clause and, in addition to the invalidated monetary benefits provision, a possibly valid physical power sale option, they were potentially partially enforceable. *See id.* at 826.

## 2. *The Alcoa Amendment (*PNGC II*)*

As it turned out, the physical power sale option in the Block Contracts was never exercised. Instead, after *PNGC I*, BPA entered into an amended contract with Alcoa ("the Alcoa Amendment") in which it again agreed to subsidize Alcoa rather than sell it power directly. Specifically, "BPA agreed voluntarily to make a nearly $32 million cash 'benefit' payment" to Alcoa during fiscal year 2009, which Alcoa could use to "purchase power from one of BPA's competitors." *PNGC II*, 596 F.3d at 1068–69.[3] BPA argued that this subsidy was necessary to avoid interruption of Alcoa's smelter operations; would assure the continued existence of the DSI load (which had historically benefitted BPA in various ways); and was only an interim fix before BPA could carry out the full administrative process needed to respond to the remand issues in *PNGC I. Id.* at 1081–84.

Once again, BPA's priority customers filed a legal challenge, and once again we invalidated the subsidy, holding

---

[3] BPA entered into a substantially similar amended contract with CFAC, not challenged before this court.

that "BPA's justifications for this unusual transaction . . . [did] not demonstrate that the transaction was 'consistent with sound business principles,' as required by BPA's governing statutes." *Id.* at 1068–69. We rejected BPA's proffered rationales as irrelevant to BPA's statutory mandate, unsupported by record evidence, or illogical. As clarified by *PNGC I*, we stated, BPA has no obligation to contract with Alcoa at all, much less "to provide [a] voluntary gift [to Alcoa] that will lead to higher rates for its other customers" and effectively subsidize its competitors. *Id.* at 1080–84. We went on to explain that protecting jobs within the region, however laudable a goal, is not among the purposes that Congress has authorized BPA to pursue. *Id.* at 1082. We suggested, however, that a "decision to sell physical power to Alcoa," as opposed to merely providing monetary benefits, "might produce a different result." *Id.* at 1085.

Finally, like the earlier *PNGC I* opinion, *PNGC II* declined to compel BPA to recover any payments it had already made to Alcoa. *See id.* at 1086. Instead, in part because the *PNGC I* remand remained pending, we remanded "to BPA to determine whether and how it [would] seek a refund from Alcoa." *Id.*

### 3. Alcoa v. BPA

After *PNGC II* issued, BPA entered into yet another contract with Alcoa, one that we upheld. *See Alcoa*, 698 F.3d at 782–85, 796. Although not directly implicated in this appeal, this final Alcoa-BPA contract merits some brief discussion, to complete the story of BPA's efforts to assist the aluminum DSIs.

Under this latest contract, BPA agreed to sell physical power to Alcoa at the cost-based IP rate for a modest profit (projected at $10,000 for the contract's initial, roughly 18-month period). *Id.* at 783. BPA's preference customers again mounted a challenge, arguing that instead of selling to Alcoa at the cost-based IP rate, BPA should focus on selling to other customers, whom it can charge higher market rates. *Id.* at 785. In the preference customers' view, BPA's failure to maximize its profits demonstrated that it "[was] not acting according to a profit-making purpose," but rather was still attempting to "subsidiz[e] Alcoa . . . so as to preserve jobs at its smelting plant and the surrounding community." *Id.* at 788–89.

In *Alcoa*, we rejected these challenges, explaining that the "sound business principles" mandate does not mean "that BPA is required to maximize its profits." *Alcoa*, 698 F.3d at 789. To the contrary, BPA has wide discretion as to how best to pursue its businesslike role while also complying with other statutory mandates, such as environmental protection. *Id.* Applying the high level of deference owed to BPA's business decisions, we allowed the most recent Alcoa-BPA contract to stand, noting that: (1) unlike the monetized energy contracts at issue in *PNGC I* and *PNGC II*, it provided only for physical power sales; (2) it was expected to yield *some* profit to BPA, albeit modest; and (3) there was no record evidence to support the preference customers' speculation that BPA's decision was motivated by concerns about job losses. *Id.* Therefore, we concluded, we had to "defer to BPA's determination" that its power sale to Alcoa comported "with sound business principles." *Id.*

**C.  The Port Townsend Contracts (*PNGC I*)**

Aside from the 2007 Block Contracts with the aluminum DSIs, also at issue in *PNGC I* was an arrangement between BPA and its sole remaining non-aluminum DSI, the Port Townsend Paper Company ("Port Townsend").  Under this arrangement, BPA agreed to "provide Port Townsend with its full requirements for power . . . to be supplied through" the Clallam County public utility ("Clallam").  *PNGC I*, 580 F.3d at 802.  BPA would sell Clallam the power at the PF rate "plus the margin typically charged by [public utilities] to their industrial customers," and Clallam would then sell the power to Port Townsend.  *Id.*  In effect, therefore, BPA would be selling power to Port Townsend, via Clallam, "at a rate below both the market rate and the IP rate," *id.* at 823, but not as low as the PF rate.

We invalidated the Port Townsend arrangement as inconsistent with BPA's statutory obligations.  *Id.* at 824.  BPA, we explained, is not obligated to sell Port Townsend power at all, much less at a subsidized rate, and had provided no convincing explanation as to why doing so comported "with 'sound business principles.'"  *Id.* (quoting 16 U.S.C. § 838g).

**D.  BPA's Decision on Remand from *PNGC I* and *PNGC II***

The present litigation arises from BPA's decision-making process on remand from our decisions in *PNGC I* and *PNGC II*.  This decision-making process became known within the Northwest power community as the "Lookback."

### 1.  Lookback Proceedings

In June 2009, BPA issued a letter indicating that it would begin addressing the issues remanded to it by *PNGC I.*

The Lookback was structured as a two-step process: First, BPA would answer the contractual questions identified in *PNGC I*: "the applicability and construction of the severability clause, the damage waiver, and the physical power sale option in light of our holdings [in *PNGC I*]." 580 F.3d at 827.  If it was determined that the contracts barred refunds, then the proceedings would end there.  If BPA determined instead that it could seek recovery notwithstanding the damages waiver, it would move on to the second step: determining how much money was owed.  BPA also considered in the Lookback whether it was "permitted to seek additional payments directly from Port Townsend Power Company (or indirectly through the Public Utility District No. 1 of Clallam County) for any undercharges for power delivered to Clallam by BPA for the benefit of Port Townsend, both during the Lookback period and subsequently."  Once *PNGC II* was decided, BPA expanded the scope of the Lookback to include any refunds that might be owed for payments made to Alcoa during the nine-month period before payments were ceased in compliance with *PNGC II.*

BPA issued a draft record of decision ("Draft ROD") in June 2010 and invited public comment.  The Draft ROD proposed three sets of conclusions: First, as to the Block Contracts, the Draft ROD proposed that the invalid rate provisions were severable from the remainder of the contracts; that the damages waiver was therefore enforceable; and that, as a result, BPA was contractually barred from

seeking recovery. BPA also proposed that this conclusion was not inconsistent with its earlier decision to seek repayment under a series of settlement agreements invalidated in *PGE*.

Second, as to the Alcoa Amendment, the Draft ROD proposed that BPA was not obligated to seek a refund, and that it did not have any contractual basis for doing so. According to the Draft ROD, "Alcoa did not breach any obligation to BPA under the Amendment, so it is not clear a legal claim for money, in the form of damages or otherwise, could be pursued by BPA under the contract based solely on *PNGC II*." The Draft ROD noted, however, that "BPA possibly could pursue an extra-contractual or equitable claim for restitution based on an unjust enrichment theory," and "specifically invite[d] the parties to comment on whether such a claim could or should be pursued against Alcoa." The Draft ROD also floated the possibility that BPA could "seek to administratively recover payments made to Alcoa under the Amendment" by adding a surcharge to future power sales to Alcoa. The Draft ROD noted, however, that: (1) such a surcharge might run into its own legal problems, as BPA is required to set rates pursuant to the strictures of the Northwest Power Act, and (2) BPA may have "already recouped some or all of any illegal overpayments under the Amendment . . . by withholding payments to Alcoa for the final two months of the term of the Amendment," i.e. after *PNGC II* was handed down.

Finally, as to the Port Townsend transaction, the Draft ROD proposed that BPA had no legal or equitable basis for recovering from Port Townsend directly. "While it appears BPA could assert an equitable claim for restitution against Port Townsend, it is not clear that Port Townsend was

unjustly enriched." Moreover, Port Townsend might have an equitable estoppel defense, although BPA concluded that it lacked sufficient information to evaluate this question.

Not surprisingly, Alcoa, Port Townsend, and Clallam all agreed with the Draft ROD's proposed findings. Alcoa, moreover, threatened that, if "BPA were to change its position and conclude that the damages waiver is *not* enforceable," then Alcoa could bring claims of its own against BPA "greatly exceeding any amount that BPA could recover from Alcoa." Specifically, Alcoa estimated that it had a potential damages claim against BPA totaling $218 million, based on the difference between Alcoa's power costs during the time period covered by the monetized contracts and what its power costs would have been had BPA sold it power directly at the IP rate during that time.

The preference customers viewed the Draft ROD very differently — as yet another instance of BPA capitulating to the DSIs. Both PPC and PNGC argued that BPA had not just the legal authority but also the duty to seek repayment of the unlawful subsidies. ICNU submitted similar comments.

None of BPA's major conclusions changed in its final record of decision ("the ROD"), issued February 18, 2011. In the ROD, BPA decided not to pursue refunds of any of the subsidies invalidated in *PNGC I* and *PNGC II*, explaining its reasoning as follows:

1.  As to the 2007 Block Contracts, BPA is contractually prohibited from seeking repayment because the damages waiver in those contracts is applicable and enforceable.

2.  As to the Alcoa Amendment, which does not contain a damages waiver, while BPA is not contractually prohibited from seeking repayment, it has no "reasonable legal or equitable basis for doing so."[4]   Alcoa fully performed its contractual obligations, leaving BPA without any basis for a contract action, and BPA would be unlikely to prevail in any quasi-contract action. Moreover, if BPA sues Alcoa, Alcoa has indicated that it will bring its own action against BPA, and the low likelihood of success of any BPA suit is not worth the risk (even if small) of owing a judgment to Alcoa.

3.  As to the Port Townsend Contract, BPA has no legal or equitable basis for seeking repayment.  Because the Port Townsend Contract formally consisted of two separate bilateral contracts (BPA-Clallam and Clallam-Port Townsend), BPA had no direct contractual relationship with Port Townsend, and has no equitable or quasi-contract basis for suing Port Townsend.  While BPA did have a direct contract with Clallam, "Clallam was no more than an intermediary" between BPA and Port Townsend, and therefore was not "enriched, unjustly or otherwise," by the contract.  Even if BPA could recover from Clallam, doing so "would not be fair or just" because "it would be nearly impossible for Clallam to recover [in turn] from Port Townsend."

ICNU, PPC, PNGC and its members, and the Canby Utility Board filed petitions in this court for review of the ROD.  Port Townsend, Alcoa, and several investor-owned utility companies ("IOUs") intervened to defend the ROD.

---

[4] *PNGC II* mistakenly stated that the Alcoa Amendment incorporated the damages waiver by reference.  *PNGC II*, 596 F.3d at 1086.

## STANDARD OF REVIEW

As petitions for review of BPA decisions are governed by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), "[w]e affirm BPA's actions unless they are arbitrary, capricious, an abuse of discretion, or in excess of statutory authority." *PGNC II*, 596 F.3d at 1072 (internal quotation marks omitted). When, as here, we are measuring BPA's actions against the "sound business principles" standard embodied in BPA's governing statutes, "we are particularly deferential to the agency's assessment of whether its actions further BPA's business interests consistent with its public mission." *Id.* at 1080 (internal quotation marks omitted). This deferential standard of review is not, however, toothless. While "we do not second-guess [BPA's] policy judgments," we do ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Alcoa*, 698 F.3d at 788 (internal quotation marks omitted); *see Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc).[5]

---

[5] Although BPA and Port Townsend challenge ICNU's standing, "[o]nly one of the petitioners needs to have standing to permit us to consider the petition for review," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). No party contests PPC's standing, and there is no basis for doing so.

In addition, ICNU has standing through at least two of its members, International Paper and Weyerhauser. The record indicates that both these companies have "pass-through" contracts to purchase electric power from BPA preference customers, pursuant to which they are required to "pay for all BPA rates and charges incurred by" the preference customers in providing them with electric service. Thus, they are "directly impacted by any rate increased adopted by BPA." We recently held similar contracts and injuries sufficient to support standing in another suit brought

## DISCUSSION

### A.  Constitutional and Statutory Arguments

Petitioners argue, first, that BPA has a duty, under either the Constitution's Appropriations Clause or BPA's governing statutes, to seek all refunds to which it may be entitled.  We disagree.   BPA decisions not to seek refunds must be evaluated, like all other BPA decisions, case-by-case, applying BPA's governing statutes, the APA, and general principles of administrative law.

### *1.  Appropriations Clause*

The crux of Petitioners' Appropriations Clause argument is that, "[h]aving disbursed funds to the DSIs from the Treasury without lawful authority, [BPA] acted in direct violation of the Constitution.  Therefore, it now has a duty to seek recovery of these illegally-paid funds."   (citations omitted).

Viewed as a general challenge to BPA contractual damages waiver provisions, this argument is foreclosed by *Alcoa*, 698 F.3d at 791.  *Alcoa* rejected the argument "that BPA is constitutionally obligated to sue for any damages to which it is entitled." *Id.* at 791.  In so ruling, *Alcoa* noted that the BPA administrators have statutory authority to compromise or settle claims, and held that a bilateral waiver provision is consistent with that authority, as it balances in advance the risk of being sued for damages against the

against BPA by the customers of its direct customers.  *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 949–55 (9th Cir. 2013).

opportunity to obtain damages from the contracting party. *Id.* at 792.

Viewed as a narrow, case-specific challenge, the Appropriations Clause argument fares no better. Any disbursements BPA made under the invalidated monetary benefits provisions likely did not violate the Appropriations Clause. BPA is funded by a permanent appropriation, or revolving fund, which the BPA Administrator has wide latitude in spending. *See* 16 U.S.C. § 838i (establishing revolving fund within the U.S. Treasury for BPA); *see also* 3 General Accounting Office, *Principles of Federal Appropriations Law* 15-159 (discussing BPA revolving fund) and 2-17 (defining revolving funds as permanent appropriations). So there may well have been an adequate appropriation for the subsidies, even though they were later held invalid.

We need not wade further into the "largely uncharted area" of Appropriations Clause law, however. *Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1486 (4th Cir. 1992) (Hall, J., concurring in part and concurring in the judgment). Even if the subsidy payments did rise to an Appropriations Clause violation, petitioners have pointed to no convincing authority establishing that BPA would therefore have a constitutional duty to recover the subsidies.

Certainly, the text of the Appropriations Clause provides no basis for inferring such a duty, nor do the cases relied upon by petitioners. *Office of Personal Management v. Richmond*, 496 U.S. 414, 416 (1990), held only that a court cannot order an agency to expend funds contrary to statute — not that, if an agency has already done so, the Appropriations Clause requires the agency to get the funds back. Certainly

agencies are generally *permitted* to seek recovery of erroneously or illegally disbursed funds. Even in the absence of a specific statutory cause of action, "[t]he Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid," so long as there is no clear statutory barrier to doing so. *United States v. Wurts*, 303 U.S. 414, 415–16 (1938).[6]

But that recovery *authority* does not suggest that the government has a constitutional *duty* to seek a refund every time an erroneous or illegal payment has been made. To the contrary, *Wurts* suggested that Congress may statutorily preclude agencies from recovering erroneously paid funds so long as it "clearly manifest[s] its intention" to do so. 303 U.S. at 416 (internal quotation marks omitted). If the Appropriations Clause imposed an affirmative constitutional duty upon agencies to recover erroneously paid funds, Congress could not eliminate the duty by statute.[7]

---

[6] *See Wisc. Cent. R.R. Co. v. United States*, 164 U.S. 190, 212 (1896) ("parties receiving moneys illegally paid by a public officer are liable ex aequo et bono to refund them"); *United States v. Fowler*, 913 F.2d 1382, 1386–87 (9th Cir. 1990) (holding that government agent's error in disbursing funds does not waive government's right to reimbursement); *Old Repub. Ins. Co. v. Fed. Crop Ins. Corp.*, 746 F. Supp. 767, 769–70 (N.D. Ill. 1990) (discussing statutory authority under which government may recover funds erroneously or illegally paid).

[7] Petitioners also point to *Fansteel Metallurgical Corp. v. United States*, 172 F. Supp. 268, 270 (Ct. Cl. 1959), which stated that "when a payment is erroneously or illegally made, it is in direct violation of article IV, section 3, clause 2 of the Constitution" and "it is not only lawful but the duty of the Government to sue for a refund thereof." *Fansteel* is not, of course, binding on us, and we decline to follow it. *Fansteel* misreads *Wurts* as holding that government has a *duty* to recover illegally paid funds; in fact, *Wurts* held only that the government "*can* recover funds

### 2.  BPA's governing statutes

Petitioners next argue, more modestly, that BPA has a *statutory* duty to seek recovery of unlawfully disbursed funds, relying on the requirement in 16 U.S.C. § 838g that BPA provide "the lowest possible rates to consumers consistent with sound business principles."  We reject the suggestion that BPA has a statutory duty to pursue *any* potentially available source of income so as to lower its rates.

As this court recently clarified, the "sound business principles" mandate does not require BPA to "maximize its profits" or to "always charge the lowest possible rates" regardless of any other considerations.  *Alcoa*, 698 F.3d at 789.  Rather, Congress has given BPA wide latitude to decide "how best to further BPA's business interests consistent with its public mission."  *Id.* (internal quotation marks omitted).  Along these lines, Congress has delegated to the BPA Administrator broad authority to compromise or settle claims.  *See* 16 U.S.C. § 832a(f).  Thus, Congress contemplated that BPA may sometimes make a business decision that it is not worth pursuing a particular potential source of income.  Petitioners' argument to the contrary fails.

## B.  BPA's decision

Although BPA has no general constitutional or statutory duty to seek a refund any time it makes an unlawful payment, an individual decision not to pursue such a refund could be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

which its agents have wrongfully, erroneously, or illegally paid," 303 U.S. at 415 (emphasis added).

### 1.  The aluminum DSI contracts

With respect to the aluminum DSI contracts, Petitioners maintain that BPA's ROD had several of these faults, because: the damages waiver is not enforceable; BPA does have available quasi-contractual or common law avenues of recovery against the aluminum DSIs, such as an unjust enrichment suit; and it is not a sound business decision to forgo those avenues entirely because of speculation that its counterparties might assert defenses.

After reviewing these challenges, we conclude that we must defer to BPA's reasonable interpretation of the 2007 Block Contracts as including a severable, enforceable damages waiver, and so do not disturb BPA's decision as to refunds of the 2007 Block Contracts subsidy payments. We grant the petition for review, however, as to the Alcoa Amendment, as we conclude that the ROD's reasons for not pursuing refunds for the subsidies proved by that Amendment are, as they stand, so insufficiently grounded in the record as to be "arbitrary, capricious, [or] an abuse of discretion."

### a.  2007 Block Contracts

Each of the 2007 Block Contracts included a damages waiver providing that, "[i]n the event the Ninth Circuit Court of Appeals . . . issues a final order that declares or renders this Agreement void or otherwise unenforceable, no Party shall be entitled to any damages or restitution of any nature, in law or equity, from any other Party, and each Party hereby waives any right to seek such damages."  Each Contract also included a severability clause providing that "[i]f any term of this Agreement is found to be invalid by a court of competent jurisdiction," "[a]ll other terms shall remain in force unless

that term is determined not to be severable from all other provisions of this Agreement by such court."

BPA's conclusion that the damages waivers are enforceable was consistent with the statute and otherwise within BPA's authority. To begin, the *Alcoa* court enforced a very similar mutual damage waiver in another Alcoa-BPA contract. Its reasons for doing so apply equally here.

Contrary to petitioners' contention that no entity operating according to "sound business principles" would agree to a sweeping waiver, *Alcoa* interpreted such a mutual waiver as a valid exercise of BPA's general claim-settling authority. 698 F.3d at 791–92. Noting that such a waiver equally protects BPA against claims brought by the customer, *Alcoa* concluded that "[i]t is not our place to second-guess the agency's considered judgment regarding the balance of risks embodied in a damage waiver or similar release or settlement provision." *Id.* Moreover, the waiver provision is severable from the contracts' void subsidy provisions. BPA received consideration in exchange for waiving its rights to seek damages from the aluminum DSIs — namely, a corresponding waiver providing that the contracting parties could not recover damages from BPA. "Legal portions of contracts are severable from illegal portions where there is separate legal consideration attributable to the severed portion of the agreement." *Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1148 (9th Cir. 1986). Finally, as such a waiver is a valid exercise of BPA's power to compromise or settle claims and could likewise protect BPA's interests, it cannot be contrary to public policy as allowing an unlawful subsidy.

The dissent's assertion that this determination is controlled by *PGE*, and not *Alcoa*, is incorrect. *PGE* did not concern provisions in BPA power purchase contracts mutually waiving damages in the event the agreement is invalidated. *Alcoa* did.

*PGE* invalidated a series of settlement agreements BPA had entered into with IOUs that participated in its Residential Exchange Program ("REP" or "Exchange Program"). *See PGE*, 501 F.3d at 1025–37; *Golden Nw. Aluminum, Inc. v. Bonneville Power Admin*., 501 F.3d 1037, 1047–48 (9th Cir. 2007). The Exchange Program "essentially acts as a cash rebate to the IOUs where the IOUs' power costs exceed those of BPA," but requires that the Exchange Program's costs be covered only by supplemental rate charges assessed on non-preference customers, not by passing costs on to preference customers. *See PGE*, 501 F.3d at 1015–16. BPA and certain IOUs entered into "settlement" agreements inconsistent with this pass-through limitation, maintaining that the limitation did not apply because the costs were "settlement costs," pursuant to BPA's general authority to make and settle contracts, rather than Exchange Program costs. We disapproved this approach, holding that BPA could not circumvent the statutory restrictions on power exchanges "by calling its actions . . . [a] 'settlement'" when those actions were "inextricably intertwined" with BPA's Exchange Program authority. *Id.* at 1032.

In short, the exercise of settlement authority at issue in *PGE* concerned the whole of a comprehensive agreement, in which BPA sought directly to avoid the statutory restrictions placed on it. *PGE* did *not* concern a severable agreement provision allocating among the contracting parties the purely retroactive liability risks that could arise in the event the

agreement is otherwise declared invalid — a second-level pact, so to speak, covering the past, not the future, and governing relief in the event the agreement is invalidated, rather than the agreement itself.

In contrast, *Alcoa* considered precisely that sort of purely retroactive, partial, and mutual waiver: As here, the waiver at issue in *Alcoa* was a bilateral waiver of retroactive damages; it gave up both parties' rights to seek compensation in the event that a portion of the contract in which it was contained was invalidated in the future. 698 F.3d at 791. In both *Alcoa* and here, the larger agreement of which the waiver was a part was risky for both parties that agreed to the provision, not just for BPA. Here, for example, the aluminum DSIs gave up their ability to sue BPA to recover any costs associated with purchasing power through other means if the contracts were invalidated, costs that could have been, and that the DSIs contend were, extensive.

The fact that the damages waivers significantly benefitted BPA is important. Upholding the validity of the waivers here does not preclude a finding in a future case that a damages waiver is invalid, if the waiver at issue in that case does not benefit the agency and is instead designed principally to prevent an unlawful subsidy from being recouped.

Despite the large differences between the waiver issue here and the settlement authority question in *PGE*, and despite the close similarity between the waiver approved in *Alcoa* and the one at issue here, the dissent dismisses *Alcoa* as the controlling precedent and relies on *PGE* instead. Principally, the dissent relies for this odd choice on the understanding that *Alcoa* upheld the other portions of the agreement in which the waiver appeared, and so was not

approving a damages waiver linked to statutorily unlawful
contract provisions.

The dissent's account mischaracterizes *Alcoa*. As one
would expect, the damages waiver in *Alcoa* applied not to
valid contractual provisions, but only when "a court renders
any part of the agreement void or unenforceable"— in other
words, unlawful. 698 F.3d at 791. And, after holding the
damages waiver lawful, *Alcoa* went on to *decline* to decide
whether the "Second Period" portion of the Alcoa contract
there at issue was valid, as the question was not yet ripe. *Id.*
at 793–94. This sequence necessarily left open the possibility
that the Second Period agreement would later be voided —
and yet, the damages waiver provision that would be
contained in that agreement had already been declared valid.

The panel deciding *Alcoa* was entirely cognizant of this
possibility. Had the Second Period agreement been similar
to, and valid for the same reason as, the agreement covering
the initial period, there would be no reason to put off deciding
the legality of the Second Period agreement. And the
dissenting opinion in *Alcoa* specifically recognized that the
waiver provision was valid and would apply if and when the
Second Period agreement is challenged. *Alcoa*, 698 F.3d at
799, 806–807 & n.7 (Bea, J., dissenting). The dissent's
concern was with the majority's decision to forego addressing
the Second Period dispute before BPA suffered a monetary
loss was that, because of the damages waiver, those losses
could not be recovered. *Id.*

*Alcoa* therefore decided essentially the same issue that
arises here regarding the enforceability of a bilateral damages
waiver in a BPA power agreement. *PGE* covers the
predecessor issue — was the power agreement there in fact

void?  Under such circumstances, we must follow *Alcoa* and uphold the damages waiver.

As BPA properly determined the Block Contracts waiver provisions were enforceable, its decision not to pursue refunds under those Contracts was likewise proper.

### b.  *Alcoa Amendment*

As the Alcoa Amendment does not contain a damage waiver, BPA is not contractually barred from seeking recovery of the subsidies invalidated in *PNGC II.*  BPA nonetheless declined to seek recoupment of subsidies it provided pursuant to the Amendment, viewing the chances of succeeding in doing so as slight, and outweighed by the potential recovery costs.

BPA's rationales for this conclusion boiled down to two: (1) Alcoa may have defenses to any equitable or quasi-contract claim, including perhaps an estoppel defense; and (2) Alcoa may be able to defeat a claim for unjust enrichment, and succeed on a counterclaim against BPA, by showing that, far from being enriched, it obtained *less* in monetary value than it was entitled to under the governing statutes.  We hold both rationales "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise."  *Lands Council*, 537 F.3d at 987.  As a result, we cannot approve the current ROD's conclusion as to recovery of the Alcoa Amendment subsidies.

As to the ROD's first rationale, the evaluation of the merits of any possible defenses Alcoa might assert was far too generous.  In particular, BPA's prediction that "Alcoa would have a reasonably good chance of . . . mounting a

viable estoppel defense against any claim by BPA," is particularly dubious.

It is unlikely that the DSIs could successfully estop the government from recovering a refund if, in fact, a court determined that they had received unlawful overpayments. As *Richmond* emphasized, although the Supreme Court has never categorically foreclosed estoppel against the government with regard to monetary payments, it has "reversed every finding of estoppel that [it has] reviewed." 496 U.S. at 422. Ignoring this history, BPA looked only at this court's estoppel cases, concluding "the Ninth Circuit is more receptive to claims of estoppel against the Government than some other circuits." Whether that vague comparison is correct or not is beside the point. It is of no help in assessing the actual risk of a successful estoppel claim in this case.

What *is* relevant is our actual standard: the party claiming estoppel must show both (1) "affirmative misconduct" on the part of the government and (2) that "the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage." *United States v. Hatcher*, 922 F.2d 1402, 1409, 1411 n.12 (9th Cir. 1991) (internal quotation marks omitted). Under this standard, we have very occasionally applied estoppel against the government in immigration cases. *See, e.g.*, *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1165–66 (9th Cir. 2005). But we know of *no* Ninth Circuit case estopping the government from recovering an erroneous monetary payment, nor have the parties identified one. *Cf. Heckler v. Cnty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51 (1984).

The ROD also reasoned that BPA may not be able successfully to pursue an unjust enrichment claim against

Alcoa for several reasons. One concern expressed in the ROD was that a claim for unjust enrichment cannot lie where the relationship between the parties is governed by a valid express contract concerning the particular issue. *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 408–09 (9th Cir. 1992). But by the time the ROD here challenged issued, this court had already invalidated the relevant portion of the Alcoa Amendment. *See PNGC II*, 596 F.3d at 1085–86. That being so, no *valid* contractual provision stood in the way of an unjust enrichment claim.

The ROD's second rationale — that Alcoa may be able to show that it was not enriched, but rather illegally disadvantaged, by the subsidies in the Alcoa Amendment — has more support in the record. The record does establish, at least, that the amount of any damages BPA could actually recover from the aluminum DSIs is uncertain and disputed. Moreover, if BPA sues, Alcoa could well counterclaim, arguing that it actually *lost* money through the partially invalidated contracts.

Had BPA not insisted on a monetized contract, Alcoa maintains, BPA could have (and, according to BPA, likely would have) sold Alcoa physical power instead at the IP rate. The ROD noted Alcoa's contention that, as matters turned out, Alcoa had to pay a significantly higher rate during the Alcoa Amendment period than the IP rate because of rising market rates.[8] The ROD also acknowledged that Alcoa had

---

[8] More specifically, Alcoa's explanation in its briefs to this court of its position begins by pointing out that, if BPA sells to DSIs, it must offer them the IP rate, rather than a market rate. *See PNGC I*, 580 F.3d 812–13; *PNGC II*, 596 F.3d at 1073. Alcoa then represents that, as demanded by BPA and required under the 2007 Block Contracts and Alcoa Amendment,

argued previously that it "is potentially entitled to recoup those additional payments." Alcoa's brief to this court elaborates on its overpayment argument, maintaining that, far from receiving overpayments under the 2007 Block Contracts and the Alcoa Amendment, the company ended up paying "$218 million more for power than it would have" had BPA sold it power directly, including $26.1 million during the Amendment period.

One major flaw in Alcoa's argument, and BPA's acceptance of it as sufficiently meritorious to constitute a substantial risk in any litigation to recover, is that BPA could — under our *PNGC* decisions — have refused to sell Alcoa power at all, leaving Alcoa to buy power at full market rates. But Alcoa's position is still not entirely implausible. Given BPA's practices regarding Alcoa, it might be hard for BPA to establish as a factual matter that it would have refused to sell Alcoa power at the IP rate. And Alcoa's persistence as to its contention suggests that it would take an equally aggressive litigation position in any collection action BPA might initiate. In that light, as BPA argued, choosing to pursue recovery

it entered into forward power purchase contracts "at a time when power prices were relatively high." The rates it obtained were well above what it could afford and, even after applying the credits that it received from BPA under the 2007 Block Contracts and Amendment, were significantly higher than the IP rate. The third link in Alcoa's net loss argument is that, assuming that BPA would have offered to sell to Alcoa at the IP rate in the absence of the Amendment (as it has said it would have), Alcoa paid more, rather than less, than had it not entered into the Amendment. Further, when the contracts were invalidated, Alcoa had to resell the power back into the market to "unwind" its purchases, and because the market had declined, it sold this power at a rate significantly lower than what it had paid.

from Alcoa "would expose BPA to *some* risk of a judgment to Alcoa under its theory of underpayment."

But the ROD did not objectively evaluate the degree of this risk so much as capitulate to Alcoa's threats. As noted, the above explanation of the possible counterclaim comes largely from Alcoa's briefs and comments, not the ROD. The ROD vaguely implies that the costs and risks of litigation would outweigh its possible benefits, citing statutory and regulatory provisions requiring agencies to weigh costs of collection actions against benefits. At the same time, the ROD acknowledged, in a conclusory fashion, that "Alcoa's purported claim that it has been underpaid by almost $200 million is dubious," yet nowhere ventured any alternative estimate of a likely litigation outcome, or of the litigation costs likely to be incurred in obtaining that outcome.

In fact, as petitioners point out, BPA never attempted "to calculate the actual amounts paid" to the aluminum DSIs, and so was in no position to determine whether there were or were not net overpayments to Alcoa. Those gaps are reason enough for skepticism about the ROD's conclusion that, *whatever* those amounts are, they are not worth trying to recover. In addition, the final ROD evaluated only possible avenues for litigation, not other ways BPA might seek to recover the subsidies, such as offsets from future sales contracts with Alcoa.

We may not uphold an agency decision that "entirely failed to consider an important aspect of the problem." *Lands Council*, 537 F.3d at 987. BPA's assumption that Alcoa might succeed in showing that it was not enriched, and could even recover on an affirmative counterclaim, suffers from such a lapse. We therefore remand to BPA to provide a

defensible estimate of the amount of the subsidy it provided to Alcoa under the Alcoa Amendment prior to its invalidation; to provide some analysis of whether Alcoa's claim of net underpayment has any fair chance of success; to analyze alternative plans for recovery of any overpayment to Alcoa; and either to adopt one of those plans or to explain why, with respect to each of them, the costs and downside risks justify abandonment of the opportunity to recover any overpayment.

### 2. *Port Townsend-Clallam*

In contrast to its treatment of the Alcoa Amendment, BPA's decision not to seek repayment from Port Townsend was in no respect unreasonable. Whether and how much BPA could recover from Port Townsend is entirely uncertain, both legally and practically. And, given the small amount of power sold under the Port Townsend Contract, the amount of any recovery would necessarily be quite small, making it unlikely that the costs of litigation would be justified.

First, unlike the aluminum DSI contracts, the Port Townsend Contract involved a sale of power, not a subsidy, though at an unlawfully low rate. So it is unclear exactly what amount, if any, Port Townsend would owe BPA. Perhaps BPA could argue that Port Townsend owes it the difference between what it paid and what the same amount of power would have cost at the higher IP rate. But Port Townsend could plausibly counter that, had the rate been higher, it would have purchased less power, or even no power at all, given its struggles to stay open in the face of large financial losses and its reliance on the power prices provided by BPA to do so.

A second, supervening problem with recovering under the Port Townsend Contract, BPA concluded, is that, unlike the aluminum DSI contracts, this arrangement was structured as two separate bilateral contracts: one between BPA and Clallam, and one between Clallam and Port Townsend. The ROD observed that BPA had no direct contract with Port Townsend, and that, although it could try to back-bill Clallam, "it is far from clear . . . that Port Townsend would voluntarily remit [the back-billed] amount to Clallam" in return.

Third, the ROD noted that Port Townsend could argue that any claims against it were discharged in Port Townsend's bankruptcy. BPA expressed skepticism about this assessment, noting that Port Townsend's bankruptcy plan was approved in January 2007, while *PNGC I* was not issued until December 2008. Thus, BPA could argue that its claims against Port Townsend were not yet within "fair contemplation" at the time of the bankruptcy proceedings, and therefore were not discharged. But even if not a legal bar to recovery, Port Townsend's bankruptcy supports the overall reasonableness of BPA's decision, as it casts doubt on Port Townsend's practical ability to satisfy any judgment that BPA might secure.

BPA's justifications for not pursuing recovery under the Port Townsend Contract are perhaps not as well substantiated as they could be. Nevertheless, BPA's decision not to pursue recovery from Port Townsend does have a sufficient reasonable basis, to which this court must defer. *See PNGC II*, 596 F.3d at 1085.

**C. Inconsistency with the Residential Exchange Program Settlement Agreements**

Finally, BPA reasonably explained why the refund decisions here challenged were not inconsistent with BPA's earlier decision to seek recovery of the different payments that had been declared unlawful by this court in *PGE.*

After we invalidated the settlement agreements in *PGE*, the question then arose whether BPA would seek to recover the improperly passed-on payments from the IOUs. BPA concluded that, after our *PGE* decision, the IOUs could not legally retain the funds, reasoning that,

> because the Court held that BPA acted beyond the scope of its statutory authority when it executed the 2000 REP Settlement Agreements and the Court did not carve out any exception with respect to the invalidity clause or any other clause, BPA believes the 2000 REP Settlement Agreements are invalid in their entirety. As a result, the invalidity clause is also invalid and cannot be used as a shield to prohibit BPA from recovering 2000 REP Settlement Agreement benefits from the IOUs through the Lookback proposal.

*2007 Supplemental Wholesale Power Rate Case Final Record of Decision*, p. 178.

In the ROD here challenged, BPA provided two bases for reconciling its decision not to seek repayment in this instance with its contrary decision regarding the Exchange Program settlement agreement overpayments. First, BPA interpreted

*PGE* as a ruling "that the REP Settlement Agreements were void *ab initio*," whereas *PNGC I* and *PNGC II* only partially invalidated the contracts at issue. Second, BPA characterized the DSI contracts here at issue as exercises of BPA's "commercial role" as a power marketer, and thus distinguishable from the Exchange Program settlement agreements, which it characterized as exercises of "BPA's sovereign role as a regulatory administrator of the REP."**[9]**

"Unexplained [agency] inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also* 5 U.S.C. § 706(2)(A). Here, however, BPA has provided a reasoned explanation as to how the two situations vary sufficiently that they may be treated differently. BPA's decision not to seek refunds here is therefore not arbitrary or capricious as inconsistent with its contrary conclusion post-*PGE*.

## CONCLUSION

We have noted before that BPA's governing statutes subject the agency "to a variety of . . . potentially conflicting statutory directives." *APAC*, 126 F.3d at 1164. "BPA's peculiarly dual role, as both a federal agency and a power business, can create situations in which it can fulfill neither

---

**[9]** In addition, the waiver provisions in the two contracts differ; the 2007 Block Contracts at issue in *PNGC I* contained a *mutual* damage waiver, whereas the REP Settlement Agreements contained a one-way waiver that protected only the IOUs and therefore is less defensible as a sound business decision.

role very well and so has reasons to test the limits of its statutory authority." *PNGC II*, 596 F.3d at 1086.

In this instance, BPA's decisions in most respects sufficiently and reasonably balance its competing obligations to merit our deference, but in one respect, on the current record, do not. We therefore DENY the petition for review with regard to the decision not to seek refunds with respect to the 2007 Block Contracts and the Port Townsend Contract. We GRANT the petition and REMAND to BPA for further proceedings, consistent with this opinion, with regard to recovery of subsidies paid under the Alcoa Amendment.

**DENIED IN PART, AND GRANTED AND REMANDED IN PART. The parties shall bear their own costs on appeal.**

REINHARDT, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion in part, but dissent from section B.1.a which relates to the 2007 Block Contracts. The question in that section is whether BPA may use a contractual damages waiver provision to strip itself of its obligation to seek recovery of $100 to $200 million in funds that it expended not only illegally but contrary to the statutory limits on its authority. The answer to that question is necessarily no. The majority's contrary answer allows BPA to violate its statutory limitations at will and to shield itself against taking any measure to remedy its unlawful actions. I would hold that this damages waiver provision, as applied, operates in excess of BPA's statutory authority.

In my view, this case is controlled by our holding in *Portland General Electric Co. v Bonneville Power Administration* (*PGE*), 501 F.3d 1009 (9th Cir. 2009). In *PGE*, we held that BPA's contracting *and* settlement powers are "limited by the constraints of the [Northwest Power Act]." We explained:

> Section 2(f) grants BPA the power to enter into contracts,[1] but it says nothing about the kind of contracts which BPA may sign. We think it obvious, as a matter of general administrative law, that the contracts into which BPA may enter must be grounded in the authority, express or implied, that Congress has granted BPA.

*Id.* at 1030. We then went on to list a series of contracts that would clearly lie outside of the authority that Congress granted to BPA. For example, we stated that BPA could not enter into a contract to acquire an NBA franchise.[2] *Id.* So

---

[1] Section 2(f) of the Bonneville Project Act provides that, "Subject only to the provisions of this chapter, the Administrator is authorized to enter into such contracts, agreements, and arrangements, including the amendment, modification, adjustment, or cancelation [sic] thereof and the compromise or final settlement of any claim arising thereunder, and to make such expenditures, upon such terms and conditions and in such manner as he may deem necessary." 16 U.S.C. § 832a(f). Section 9(a) of the Northwest Power Act later reaffirmed this grant of contracting and settlement authority. 16 U.S.C. § 839f(a); *see also PGE*, 501 F.3d at 1017.

[2] In *Pacific Northwest Generating Cooperative v. Bonneville Power Administration (PNGC II)*, we similarly made clear that BPA's mere authority to enter into a contract could "not insulate from review" its decision to do so. 596 F.3d 1065, 1073 (9th Cir. 2010).

too, as we held in *PNGC I*, it may not enter into a monetization contract that functions as an impermissible subsidy of the aluminum industry. *Pac. Nw. Generating Coop. v. Dep't of Energy (PNGC I)*, 580 F.3d 792, 823 (9th Cir. 2009).

Admittedly, BPA's authority to monetize and thus subsidize its DSI customers presented a closer question in *PNGC I* than the example given in *PGE* in which BPA would acquire the Portland Trail Blazers, and likely rename them the Bonneville Smelters. Nevertheless, in *PNGC I*, we held that BPA's monetization of power at subsidized rates was (as would be the purchase of the Trail Blazers) "inconsistent with BPA's authority under the [Northwest Power Act]." *PNGC I*, 580 F.3d at 823. In other words, BPA's decision to "giv[e] a few of its customers $300 million," *id.*, was "so arbitrary and capricious as to violate its statutory obligation." *Alcoa Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 789 (9th Cir. 2012).

BPA argues that it is not permitted to seek recovery of the illegally transferred funds because the contracts contain damages waiver provisions. The majority holds that the contractual waivers are a valid exercise of BPA's power to settle claims. Maj. Op. at 28. But just as BPA's authority to enter into contracts is constrained by its statutory limitations, so too is its authority to settle claims. As we stated in *PGE*, "Congress could not have made it any clearer that it intended for BPA to exercise its general settlement authority within the confines of the [Northwest Power Act]." 501 F.3d at 1028. That BPA's settlement authority is constrained by its statutory limitations in the same manner as is its contracting authority follows necessarily because otherwise BPA could accomplish by settlement precisely what it could not

accomplish by contract in the first instance. A settlement provision allowing BPA to retain title to the Bonneville Smelters and permitting the former owners of the Trail Blazers to retain the illegally transferred purchase price would, for example, certainly not lie within BPA's settlement authority.

Here, the majority's holding allows BPA to accomplish the very subsidy of the aluminum DSIs that we held in *PNGC I* to be unlawful and outside of its statutory authority. Because we held in *PGE* that "[a] settlement agreement must not be a means of bypassing congressionally mandated requirements," a damages waiver provision must be interpreted in a manner that forbids such circumvention of the limitations on BPA's statutory powers. *See* 501 F.3d at 1030. Construing the provision consistently with BPA's statutory mandate requires that we hold that the damages waiver provision may not be applied here so as to shield the illegal subsidy and allow the aluminum industry to retain the unlawful payments provided for in the 2007 Block Contracts. Unfortunately, the majority fails to acknowledge that *PGE* is the controlling case.

In upholding BPA's decision not to seek the return of the illegally transferred funds, the majority relies primarily on our holding in *Alcoa v. Bonneville Power Administration* that a damages waiver provision similar to the ones at issue here falls within BPA's claim-settling authority. Maj. Op. at 30–32. *Alcoa* does not control this case. *Alcoa upheld* BPA's sale of power to a DSI at a below-market rate, concluding that the terms of sale specified in the agreement — unlike the unlawful subsidies that are the subject of this case — were lawful and valid. 698 F.3d at 789. Finding no violation of the agency's statutory mandate, we then turned

to the petitioners' challenge to the agreement's damages waiver provision and upheld its inclusion in the contract. *Id.* at 791–92.[3]   In short, the damages waiver provision we upheld *in general* was included in a contract that did not itself provide for illegal subsidies or otherwise for violations of BPA's governing statutes.   Because we held that the transaction at issue in *Alcoa* was *consistent* with the statutory limits on BPA's authority, we had no occasion to consider whether a damages waiver provision that would allow BPA's customers to retain unlawful benefits afforded them *contrary* to BPA's statutory limits lies within BPA's settlement authority.  The answer appears otherwise.

That *Alcoa* did not address the issue we encounter in this case is evident from BPA's brief in *Alcoa*.   There, BPA argued that any holding recognizing BPA's general authority to waive damages in a contract would have no bearing on a

---

[3] It is immaterial that *Alcoa* declined to address the validity of the "Second Period" portion of the Alcoa contract.  In *Alcoa*, we held that petitioners' challenge to the Second Period did not survive our standing or ripeness inquiry in part because an amendment to the Alcoa contract "eliminated all references to the Second Period," meaning that "BPA and Alcoa would need to enter into a new contract that includes a similar Second Period before the petitioners could point to even the *threat* of suffering harm." 698 F.3d at 793–94.  It would have been quite peculiar to speculate how the damages waiver provision might have operated in the context of an agreement that no longer existed.  In any event, our decision not to address petitioners' challenge to the Second Period does not change the fact that, at the time we addressed the damages waiver provision in *Alcoa*, we did so in the context of an otherwise valid agreement, and therefore did not encounter the *application* of a damages waiver provision. What the majority would need to substantiate its point — and what it is clearly lacking — is a statement in *Alcoa* that the damages waiver provision could be validly applied to prevent BPA from recouping funds that it dispersed as a result of the Second Period of the Alcoa contract even if the terms of the Second Period violated BPA's statutory mandate.

situation like the one we are now presented with, in which the underlying transaction lies beyond BPA's statutory authority. BPA explicitly distinguished the case before it from the application of a damages waiver provision under the circumstances present here. Its brief told us: "The Alcoa Contract involves a sale of power, not a monetized transaction such as those under review in *PNGC I* and *II*. Therefore, this case does not involve any issue of BPA 'recouping illegal payments' because no such payments will be made." Answering Br. of Resp't Bonneville Power Admin. at 75, *Alcoa*, 698 F.3d 774 (No. 10-70211). This statement makes clear that BPA expressly disclaimed the authority to apply a damages waiver provision to prevent the agency from recouping funds transferred without statutory authority. The fact that the majority has now, on the basis of *Alcoa*, granted BPA the authority it expressly disclaimed is striking.[4] But even setting that concern aside, BPA's brief to the *Alcoa* court proves that *Alcoa* could not have possibly decided the issue present in this case – whether a damages waiver provision which does prevent BPA from recouping funds transferred without statutory authorization is permissible – because BPA explicitly distinguished that issue from the one presented in *Alcoa*.

---

[4] I note but need not rely on the argument that BPA may be precluded by judicial estoppel from relying on *Alcoa*. Judicial estoppel bars a party from making an argument in a judicial proceeding that directly contradicts an argument on which it prevailed in a prior proceeding. *See Russell v. Rolfs*, 893 F.2d 1033, 1037–39 (9th Cir. 1990). BPA assured this Court that if we ruled for it in *Alcoa*, our decision would not concern "any issue of BPA 'recouping illegal payments.'" Having prevailed on its argument, it now tells us the opposite – that our decision in *Alcoa* decided precisely the issue that BPA said our decision would not affect.

That we did not intend *Alcoa* to authorize the settlements at issue here is further evident from the *Alcoa* court's failure to discuss or even mention *PGE*. *PGE* clearly requires BPA to exercise both its contracting and its settlement authority in a manner consistent with its statutory obligations. *See* 501 F.3d at 1030–31. Thus, *Alcoa* did not and could not have authorized BPA, by means of its settlement authority, to surrender its right to seek restitution from the beneficiary of funds transferred to them in excess of BPA's statutory authority without creating a direct conflict with the principles that we established in *PGE*. The only reading of *Alcoa* that is consistent with *PGE* is that *Alcoa* approved the general authority of BPA to include damages waiver provisions in its agreements, a conclusion with which I firmly agree. Viewed in this light, it is obvious why the *Alcoa* court did not discuss *PGE* — we were simply not presented with the unlawful application of a damages waiver provision because we did not rule any part of the agreement at issue invalid. Had we done so, and had the damages waiver provision applied, we certainly could not have escaped the requirement expressed in *PGE* that BPA must exercise its contracting *and* settlement authority within the confines of its governing statutes.

The majority disagrees, reasoning that the damages waiver provisions at issue here and in *Alcoa* look alike, and that *Alcoa* therefore controls. That *Alcoa* did not consider the application of a damages waiver provision to a disbursement of funds in contravention of BPA's statutory authority is of no consequence to the majority. To my colleagues, the fact that the provisions are similar ends the inquiry. Thus, the necessary consequence of the majority opinion is that *Alcoa* — without mentioning *PGE* — has blessed not only BPA's

general authority to include a damages waiver provision in its agreements, but also every application of such a provision.[5]

Recognizing that this position is unsustainable, the majority attempts to disclaim such a holding by noting that if a damages waiver "does not benefit the agency and is instead designed principally to prevent an unlawful subsidy from being recouped," then such a waiver would be invalid. Maj. Op. at 30. However, this case demonstrates why the majority's ostensible limit on its decision will have no practical effect. Before our Court, ICNU made the precise argument that the majority claims would be sufficient to invalidate a damages waiver; it argued that the waiver "was *designed to ensure* that . . . BPA could circumvent Congress' goal of prohibiting sales to the DSIs at rates lower than the market or legal rate" (emphasis added). BPA countered that "the damages waiver is intended to broadly protect both BPA and Alcoa from damages claims that either party could bring against the other." In fact, an agency's motive in agreeing to a waiver of damages may well be mixed. There will ordinarily be some potential benefit to it if it is protected against damages. In short, it may very well be true that the

---

[5] The majority also relies on the fact that in each of the 2007 Block Contracts, the damages waiver provision is severable from the invalid provisions that unlawfully subsidize the aluminum industry. It is difficult to understand why. No one has suggested that the damages waiver provision is itself invalid. Rather, it is only its *applicability* to the unlawful subsidization that is at issue. To suggest that severing the unlawful subsidization provisions from the damages waiver provision somehow precludes BPA from seeking to recover the amounts it paid under those unlawful provisions makes no sense whatsoever. In fact, the severance shows only that the payments were beyond BPA's authority, not that BPA's customers must be allowed to keep the $100 to $200 million in subsidies that BPA unlawfully gave them.

damages waiver provisions both protect BPA from potential liability and were "designed principally" to ensure that the aluminum companies could retain their subsidies — whether they were lawful or not.

Here, it was "apparent" that charging the DSIs a rate that was below both the rate authorized by statute and the rate available on the open market conflicted with BPA's statutory mandate, and was therefore "highly suspect." *PNGC I*, 580 F.3d at 821. Under these circumstances, it is reasonable to conclude that when BPA included a damages waiver provision in its contracts with the DSIs, it knew that there was at least a substantial likelihood that this Court would declare the $100 to $200 million in subsidies to have been unlawfully paid, it knew that the damages waiver provisions would allow the DSIs to keep their ill-gotten gains, and such was a principal reason for including the damages waiver provisions in the contracts. In my view, however, it is not even necessary to reach the question of why BPA included the damages waiver provisions in its contracts with the DSIs. The proper approach is simply to apply our binding precedent in *PGE* and ask whether BPA is invoking a damages waiver provision in a manner that is contrary to its statutory authority.[6] The answer to that question is clearly, yes.

In this case, BPA operated contrary to its statutory authority in subsidizing the aluminum companies in the amount of $100 to $200 million, not only by making the

---

[6] Of course, *PGE* does not bar the application of *all* damages waiver provisions. Such a provision could still apply if an agreement is otherwise invalid for a reason that does not implicate BPA's statutory authority, such as when an agreement is invalid for conflicting with general principles of contract law.

initial payments but by failing to seek restitution of the amounts illegally transferred. Its reliance on general damages waiver provisions in the agreements as precluding it from securing the return of those payments is without support in the law. Therefore, I would hold, consistent with *PGE*, that applying a damages waiver provision to prevent BPA from obtaining recovery of illegally transferred funds is beyond BPA's statutory authority. I respectfully concur in part and dissent in part.